## McElrath *et al. versus* The Pittsburg and Steubenville Railroad Company *et al.*

1. The Act of April 11th 1862, giving the Supreme Court the powers of a court of chancery in corporation mortgages, does not violate the Constitution of the United States, as to a mortgage dated before its passage, in which the remedy provided for the payment of interest is permissive not exclusive.

2. The Act of 1862 is merely remedial for a breach of contract, and a party in default cannot complain that an additional remedy is given for his breach of contract.

3. A railroad company entered into a contract for finishing their road in a specified time, and in accordance with its terms delivered their coupon bonds from time to time to the contractor as the road progressed; the road having been finished, but not within the time specified, it was held that they were estopped from setting up a claim for damages for the delay of finishing against holders of the bonds who had received them bonâ fide from the contractor.

4. A railroad company constructed part of its road through another state and mortgaged all their rights, &c., in the whole road; the trustee in the mortgage being within the jurisdiction of the court, can be authorized and compelled to sell whatever interest of the company will pass under the terms of the mortgage.

March 16th, 18th, 22d and April 1st 1867. Before WOODWARD, C. J., THOMPSON, STRONG and AGNEW, JJ. READ, J., absent.

This was a bill in equity, filed in the Supreme Court, Western District, to October and November Term 1865, certified to the Eastern District, and filed there January 16th 1866.

The bill was by Thomas McElrath, trustee in a mortgage of the Pittsburg and Steubenville Railroad Company, and George Bradshaw, a holder of bonds secured by the mortgage for himself and such others holding bonds, &c., against the Pittsburg and Steubenville Railroad Company, Ambrose W. Thompson and Daniel Tyler, trustees in another mortgage of said company, James Andrews and others, holding certificates of indebtedness of said company, John McBroom and Hugh Woods, claiming to have a lien (which is now claimed to belong to E. P. Jones and others) on the premises described in the mortgage, Abram Nicholson and William S. Manfull, also claiming to have a lien on said premises, Edgar B. Todd and others, judgment-creditors of said company, the Western Transportation Company, claiming to be lessees, &c., of the premises, the Chartiers Valley Railroad Company and the city of Pittsburg, claiming some interest in the premises.

In their bill the complainants aver the incorporation of the Pittsburg and Steubenville Company under an Act of Assembly of March 24th 1849; their making a mortgage, dated August 1st 1856, on all their property, franchises, &c., to McElrath in trust to secure 1000 bonds of $1000 each, with their interest coupons, at the rate of 7 per cent. per annum, payable half yearly on the

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

first days of February and August, convertible into stock before August 1st 1881, it being expressly agreed that the proceeds of the bonds should be applied to the construction of their railroad and its works, and in default of payment of principal and interest, and upon the request of the holders of one-fourth in amount of the bonds, the trustee, in six months after demand and default, to take possession of the mortgaged premises, use the same, collect the tolls, &c., and, after paying expenses, &c., apply the receipts to pay the bonds and interest, it being further provided that the directors of the company, for the protection of the bondholders, might deliver the premises to the trustee for a term certain for the same purposes, and the directors again to resume possession; and that upon failure to pay the bonds and interest as above mentioned at the request of one-fourth of the bondholders, the trustee should sell the premises at public auction on sixty days' notice; it being also provided that the trustee might institute any proceedings in law or equity on the mortgage which he might deem expedient for the benefit of the bondholders; and also that the company, with the consent of the trustee, if deemed to the interest of the company, might sell any of their real estate; that the company, without the consent of the trustee, may sell or renew, &c., their personal property, when deemed necessary for the proper management of the road; and that any other real or personal estate purchased, and all improvements, &c., should be taken to be a part of the mortgaged premises, under like trusts.   The bill avers that all the bonds secured by the mortgage had been issued, and that Bradshaw held five of them; that the mortgage is a first lien on the premises, and the holders of the bonds secured by it are entitled to be paid their principal and interest in full; the bill further avers that afterwards, on the first day of August 1856, the company made to Ambrose W. Thompson and Daniel Tyler, in trust, &c., a mortgage on the same premises, expressly subject to the mortgage to McElrath to secure bonds of different denominations, with like coupons, to the amount of $500,000, for the same purposes, with the same provisions, and payable at the same time as those of the first mortgage; that this mortgage is a second lien; that all the bonds have been issued and are outstanding; that the company afterwards issued certificates of indebtedness to the amount of about $90,000 (a copy of one of the certificates being annexed to the bill), which are held by persons too numerous to be made parties; and that James Andrews, T. Hotchkiss and M. O'Hara, made defendants, are holders of such certificates, and sufficient to represent that interest; that McBroom, Woods, Nicholson and Manfull allege they have been contractors and did some work on the company's railroad, and have a lien thereon; that Baxter and others appear to be judgment-creditors of the company, and claim a lien on the mortgaged premises; that the

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

Western Transportation Company claim to have a contract with the Pittsburg and Steubenville Company for completing the road and leasing it when finished, &c., and also to be the holders of some income bonds issued about October 1856 (a copy of one of which is attached as an exhibit) ; that the Chartiers Valley Railroad and the city of Pittsburg severally claim to have some contracts with the Pittsburg and Steubenville Company, and the complainants aver that none of these indebtednesses and contracts can affect the priority of lien of the first mortgage ; the complainants further aver that the bonds secured by the two mortgages were issued for a full and valuable consideration; that when issued coupons were attached, the first being payable February 1st 1857; that the certificates of indebtedness were issued to persons to whom the company acknowledged themselves indebted, and some were outstanding.  The complainants further aver that the company, soon after their incorporation, commenced and proceeded in building their railroad, but having become embarrassed, they abandoned it about the year 1858 ; that the company is irretrievably insolvent, and is indebted for the bonds secured by the mortgages with the coupons, except about $25,000 of coupons of each mortgage retained by their treasurer when the bonds were issued ;· is also indebted on the certificates of indebtedness about $90,000, and also on income bonds for about $18,000 to the Western Transportation Company, and also in floating debts to about $200,000 ; that the railroad intended to be built by the company extends from Pittsburg to the Virginia state line, a distance of 34 miles, and, although prosecuted by some contract with the Western Transportation Company, is still unfinished ; that the company is unable to pay any of said debts, and the holders of a large amount of the first mortgage bonds have requested McElrath to proceed thereon ; that he deems it expedient for the benefit of the holders to institute these proceedings in equity for a sale of the mortgaged premises.

They prayed that the mortgage to McElrath might be declared to be the first lien, and valid and binding upon the railroad, &c. ; that the amount due on the bonds might be ascertained, and the Pittsburg and Steubenville Company be decreed to pay the amount found due, and in default of payment, that a decree be made for the sale of the mortgaged premises.

The certificates of indebtedness were substantially as follows:—

"The Pittsburg and Steubenville Railroad Company acknowledge themselves indebted to ———, for work done on the line of the Pittsburg and Steubenville Railroad, the sum, &c. ; and the Western Transportation Company are hereby directed to pay the said sum, &c., with interest at 6 per cent. per annum, &c., out of the residue of the 40 per cent. of the gross earnings of the said road, which the Western Transportation Company are to pay

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

and apply for, and on behalf of, said Pittsburg and Steubenville Railroad Company, after the payment of the interest on the bonds specified and referred to in the indenture of lease, &c., and contract, &c., between the Pittsburg and Steubenville Railroad Company and the Western Transportation Company, ratified by the stockholders of the said railroad company on the 9th day of February 1859 ; this certified estimate, with others of like tenor and date, in all not exceeding $250,000, to be repaid pro rata by the Western Transportation Company out of any moneys in their treasury belonging to the said Pittsburg and Steubenville Railroad Company after the payment of the interest on the bonds aforesaid.''

These certificates were convertible into the income bonds of the Pittsburg and Steubenville Company.

The income bonds were substantially as follows :—

The company in each bond acknowledged to owe $1000, payable August 1st 1877, with interest at 6 per cent. semi-annually. '' This bond is issued, with others of like tenor and date, not exceeding $400,000, &c., for the purpose of providing for the additional cost of construction, beyond the original estimates for the same. And for the payment of the principal and interest of the whole of the said income bonds, the entire net income of the road of said company is irrevocably pledged, &c., subject only to the payment of the interest of the seven per cent. mortgage bonds of said Company, heretofore issued, amounting to the sum of $1,500,000.''

Manfull and Nicholson, by their answer, deny that the mortgage to McElrath was the first lien, and aver-that they held the first lien ; they aver that the mortgage to Thompson and Tyler was made on the 10th of October 1856, and not on the 1st of August 1856 : they further say that they, with others, on the 16th of June 1852, contracted with the Pittsburg and Steubenville Company to construct and finish the graduation and masonry on the entire line of the company's road, consisting of 29 sections ; that by said contract it was provided that, during the progress of the work, monthly estimates should be made, and certificates be given, upon which said company were to pay to said contractors the amounts thereof, less 22½ per cent., which was to be retained until the completion of the work, and then paid in stock of said company, which retained percentage and amount of stock was afterwards reduced to 12½ per cent.; that under said contract they did perform the work, between said 16th day of June 1852 and the 1st day of June 1856 (to which date the prosecution of said work was extended, and at which date said contract, as to any further work to be done thereon, was surrendered), which work amounted to $690,660.70, according to the estimates agreed to by said company ; upon which partial payments were made in cash, &c., to the amount of $542,877.61 ;

and in stock of the company to the amount of $83,818.48; which, after charging to said company *interest* on arrearages up to June 1st 1856, left then due to said contractors the sum of $65,948.06; that on or about the 1st of April 1861, orders on said company or " certified estimates" were received as credits, to the amount of $11,097.24, leaving due to said contractors on that date, of principal and interest, the sum of $73,646.02, which sum, with its interest, is wholly unpaid; that all the rights and interests of the other co-contractors in said contract have become duly vested in Manfull and Nicholson; that in a suit in the District Court of Allegheny, they, on the 15th day of March 1865, recovered judgment against the Pittsburg and Steubenville Company for $85,636.73, the balance due to them for work, &c., which is unpaid; that this balance is entitled to priority over the mortgages, and they pray that the court would so decree.

The Pittsburg and Steubenville Company demurred for want of equity, and because the bill does not show that Bradshaw is a holder of the bonds for value; nor that he is the holder of any overdue coupons, because the sale can be had only upon the request of the holders of one-fourth of the loan, and it does not appear that such request had been made; that a sale of the premises at the instance of a single bondholder would prevent other bondholders from converting their bonds into stock; because it does not appear that the proceeds of the bonds were applied to completing and equipping the road, and that it would be against equity to compel a sale of the road whilst unfinished and not in a condition to bring a fair price; because the bondholders are not made parties, and the bill is not framed with reference to the interests of the whole of the cestui que trusts.

The company, by their answer, admit that the whole of the bonds secured by the mortgages have been issued, but do not know whether " a full and valuable consideration" was paid for all of said bonds; that interest coupons were attached to said bonds, and the first coupon was payable on the first day of February 1857; but deny that the coupons are all due and payable from said first day of February 1857; they aver that the bonds were issued at different times, and many of them not until a comparatively recent period, and that the overdue coupons were always, or ought always to have been taken off before the bonds were issued; they deny that they have abandoned the construction of their railroad; but aver that by their agents and lessees they have completed their said road, and the same is now in use as a thoroughfare; they admit that they have not paid any of the coupons, and believe that many of said coupons and bonds have been bought up by parties now seeking to have the road sold out of their hands; they deny that they are now wholly without means to make any payment on account of said bonds, but, on

5 P. F. SMITH—13

the contrary, large sums of money will henceforth be payable to said company by the Western Transportation Company, under the terms of the aforesaid lease, which sums will be applicable to make payments on account of said interest; they deny that they are utterly and irretrievably insolvent, but that their resources, if their road be not now taken out of their hands by a forced sale, will in all probability enable them shortly to provide means wherewith to satisfy all their indebtedness; they averred that the road extends from the Monongahela river, opposite the city of Pittsburg, to the Virginia state line, in the direction of Steubenville, and is now substantially finished.

They further say, that by an Act of Assembly of March 15th 1856, and its supplements, the Western Transportation Company was created a corporation, with power to lease, finish, equip and operate the Pittsburg and Steubenville Railroad; that under the power thus granted, a contract, dated December 20th 1857, was entered into, by which the Western Transportation Company agreed to finish, equip and operate the road; that by a lease, dated December 30th 1857, the said road was leased to the Western Transportation Company for a period of twenty years from the completion thereof, with a right of renewal under certain circumstances; that the said company has finished said road, and is now actually operating it as a thoroughfare; that under the said Acts of Assembly and agreements, the said road, franchises, and the possession thereof, are vested in the Western Transportation Company; that the present proceeding to take and sell said road is misconceived; that the remedy for creditors is in the appointment of a sequestrator, who shall apply the proceeds of said agreement of lease to the payment and satisfaction of the claims, which will be found an adequate and sufficient remedy.

They further say, that by the agreement and lease, the Western Transportation Company was bound to finish said road without unnecessary delay, and to have the same fully completed on or before the 31st day of December 1861; that in consideration thereof, the Pittsburg and Steubenville Railroad Company were to deliver and did deliver unto the Western Transportation Company, the mortgages and bonds set forth in the bill; that the said company did not finish said road without unnecessary delay, nor fully complete the same within the time limited by the contract; that the greater part of the arrears of interest on said bonds has been occasioned by this delay, which has deprived these defendants of the expected resources to meet said interest; that the holders of the bonds, holding them as assigns of the Western Transportation Company, and with the notice of the act incorporating that company and authorizing the lease of said road, and with notice of the terms of said lease, cannot take advantage of the failure occasioned by the default of that company; that

McElrath was aware of the said agreement and lease at the time when the bonds were, from time to time, delivered for the use of the Western Transportation Company, and that the holders of said bonds are taken to have knowledge thereof, that the resources to meet the interest on their bonds were to arise out of said agreement, and that it would be inequitable to permit said bondholders to enforce the provisions of the said mortgage, regardless of the subsequent lease and agreement; that prior to the execution of the mortgages, by contract with the Pittsburg and Steubenville Company, John S. King and Ambrose W. Thompson undertook fully to construct the road, and the company agreed to issue and deliver to said King and Thompson bonds to the amount of $500,000; that afterwards, December 30th 1857, the Western Transportation Company took the place, in the said contract, of King and Thompson, all of whose rights were assigned to the Western Transportation Company; that the first-mentioned mortgage and the bonds secured thereby were issued after the said substitution, and on behalf of the Western Transportation Company, and that Bradshaw and all other holders of said bonds derive their title through the said company and are subject to the equities between the two companies.

They further say, that the controlling portion of the stock of the Western Transportation Company and the bonds mentioned in the bill, are owned by the Pennsylvania Railroad Company, or by its officers and managers; that the design of the said company, &c., in possessing themselves of said bonds, is to take advantage of the arrears of interest occasioned by their own default, in their control of the Western Transportation Company, and by a forced sale of the road, to destroy the stock and the floating indebtedness of the Pittsburg and Steubenville Railroad Company, and possess themselves, at a cheap rate, of an important railroad, &c.; that at the date of said mortgage, August 1st 1856, there was no power in the courts of this Commonwealth to order a sale of the mortgaged premises, on the failure of the mortgagor to pay the interest; that such a remedy in default of payment of interest was matter of express provision in mortgages; that in the case of the present mortgage, the parties did not provide any such remedy; that the remedies provided, consisted of certain express remedies, enumerated in said mortgage, and the legal and equitable remedies at that time possessed by suitors in the courts of this Commonwealth, &c.; that the complainants do not in their said bill base these proceedings upon any remedy provided in said mortgage, or granted by the law as it stood when said contract was made, but claim to have a right to exhibit their said bill, &c., by virtue of an act approved since the said contract was made, namely, on the 11th day of April 1862, granting to the Supreme Court the jurisdiction of a Court of Chancery in all

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

cases of mortgages, &c.; and that it would be unjust at this time to order a sale of the premises, when it is believed enough will be realized from the road to pay the interest, &c.

The Chartiers Valley Railroad Company answered that on the 27th of April and 26th of May 1865, they entered into an agreement (setting it out) with the Pittsburg and Steubenville Company for the construction of the road of the latter, so as to accommodate both companies, and for its expenses and repairs, the former company to pay the latter $100,000, under certain stipulations in the agreement mentioned; both companies have suspended work, so as to postpone the completion of the part of the road agreed on; that the Chartiers Valley Company have paid the Pittsburg and Steubenville Company the sum of $67,542.67 on account of the consideration, and the balance remains unpaid; that the said agreement is binding, and that the rights under it ought not to be affected by the proceedings of the complainants, as the agreement was prior in time to the execution of the mortgage.

Replications were filed, and on the 3d of October 1866 Samuel G. Thompson was appointed examiner and master.

The master reported (after stating some preliminary facts):—
" After the incorporation no work of importance seems to have been done until the 16th of June 1852, when Manfull, Nicholson & Co. contracted to complete the road ' on or before the 1st day of December 1853.' These contractors, from time to time, up to the 1st of June 1856, did work on the road amounting to $692,644.52, but were unable to complete it. On the 14th day of August 1856 they abandoned their contract. For the purpose of completing the road the company, on the 10th May 1856, entered into a contract and lease with King and Thompson to complete the road in eighteen months, and, when finished, to lease it for a term of years, paying 40 per cent. of the gross earnings. About the end of 1857 they assigned their contract and lease to the Western Transportation Company, who, on the 3d of June 1858, entered into a contract to finish the road without unnecessary delay. Work under this contract was not commenced until June or July of 1862, and they commenced ' running a through line' from Pittsburg on October 9th 1865.

" There are between Pittsburg and Steubenville a bridge over the Ohio, built by the Hollidays Cove Railroad Company, incorporated by the state of West Virginia, and one over the Monongahela, built by the Pennsylvania Railroad Company.

" The company executed, January 1st 1855, to J. Edgar Thomson and others, a mortgage for $800,000. Bonds secured by this mortgage to the amount of $671,000 were issued. It being found that this sum would be insufficient to complete the road, this mortgage was satisfied, and a new mortgage for $1,000,000 and a second mortgage for $500,000 executed; the first to Thomas

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

McElrath, the second to Ambrose W. Thompson and Daniel Tyler, both in trust, dated August 1st 1856, acknowledged the 10th of October 1856, and recorded the 20th and 21st of October 1856, respectively. These mortgages were created by virtue of an Act of Assembly. The holders of the bonds, under the mortgage of January 1st 1855, took in exchange the bonds of the first mortgage for $1,000,000—thus the mortgage of January 1st 1855 was satisfied, and that of August 1st 1856, for $1,000,000, substituted. Between December 27th 1856 and June 30th 1857, King & Thompson received 970 of these first mortgage bonds, and of these they used 613 in taking up the old bonds under the mortgage of January 1st 1855. Manfull & Nicholson held 19 of these old bonds, which were handed to King & Thompson, but it does not appear that Manfull & Nicholson received any other bonds in lieu thereof. The Western Transportation Company, on the 3d of June 1858, entered into a contract to build the road. In this contract the Pittsburg and Steubenville Railroad Company agreed to deliver to the president of the Pennsylvania Railroad Company all the ' coupon first mortgage bonds to the amount of $1,000,000,' as trustee for said transportation company. Accordingly the railroad company succeeded in getting the holders of the first-mortgage bonds to give them up, and take in lieu thereof bonds of the second mortgage, dated August 1st 1856. Of the first-mortgage bonds, 959 were then placed in the hands of. J. Edgar Thomson, president of the Pennsylvania Railroad Company. Mr. Thomson delivered these bonds to the transportation company, from time to time, between the 1st of June 1863 and January 6th 1865, as work was done by that company. These bonds are now in the hands of different parties, and none of the coupons on them have been paid. All the bonds were negotiated at par."

As to the claim of Manfull & Nicholson the master reported:—

" 1. Their contract was dated June 16th 1852. Under this contract work was done, and there is due Manfull & Nicholson $72,109.86, with interest from March 15th 1865.

" 2. This contract was surrendered on August 14th 1856, and abandoned.

" 3. Manfull, Nicholson & Co. held 19 bonds issued under the mortgage dated January 1st 1855, for $800,000.

" 4. The cash balances were paid them, viz., on April 14th 1855, $4907.87 ; on May 8th 1855, $11,603.43.

" 5. King & Thompson succeeded Manfull & Nicholson as contractors, and Manfull & Nicholson took a sub-contract under them, and agreed to receive first-mortgage bonds in payment for work at par.

" 6. On the 15th of January 1857, $31,000 of the new bonds were issued to J. S. King, in exchange for a like amount of the

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

$800,000 issue, obtained by Mr. King from various parties, including $15,000 held by Manfull, Nicholson & Co., and $4000 held·by parties under them, making the $19,000, which they had agreed to surrender.

" 7. On December 14th 1855 an agreement was entered into between the contractors and the company by which they agreed to receive 75 per cent. in cash, and 12½ per cent. in the first-mortgage bonds of the company at 80 per cent. on their par value.

"· 8. At a meeting on Wednesday, August 13th 1856, the directors of the Pittsburg and Steubenville Railroad Company resolved that in payment of the cash balance due Manfull, Nicholson & Co., their drafts on the company in favor of the sub-contractors for the several amounts due them be paid as soon as said sub-contractors shall execute a release of all claims on the company for further compensation for·work, or for abandonment of work to this date, and that when all said releases to the company are obtained, the balance appearing due shall be paid Manfull, Nicholson & Co., on their signing a like release to the company ; provided, that before such drafts in favor of the sub-contractors shall be paid by the company, said Manfull, Nicholson & Co. shall agree to give security to this company to return 19 of the first-mortgage bonds heretofore issued to them for cash, at the same rate they were received by them, or *exchange the same for new mortgage-bonds of the company*.

" 9. On Thursday, August 14th 1856, at an adjourned special meeting, it was

" Resolved, That the verbal proposition of Manfull, Nicholson & Co. to take $6250 in full of all claims under their contract, and that they abandon and relinquish the same, be acceded to, subject to the following resolution.

" This resolution was in regard to a payment to a sub-contractor under Manfull, Nicholson & Co.

" Resolved, That Manfull, Nicholson & Co. be requested to return, under resolution passed yesterday, 19 mortgage-bonds of this company, and that they use their efforts to procure the balance, and that the coupons on said bonds be paid.

" Resolved, That Manfull, Nicholson & Co.'s acceptance of the terms of settlement, as per resolution passed yesterday and this day, be accepted as follows, and that Manfull & Nicholson sign the same, and it be attached to their contract.

" We hereby agree to relinquish and abandon this contract in consideration of the resolutions this day and yesterday passed by the board, the terms and conditions of which we this day accept and close.

           (Signed)            " A. S. NICHOLSON.
                                     " W. S. MANFULL.

" Pittsburg, August 14th 1856."

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

The conclusions of the master against the Pittsburg and Steubenville Railroad Company were—

" 1. That the Western Transportation Company, although its principal stockholder is the Pennsylvania Railroad Company, is not identical with that company, and the equities existing between the Western Transportation Company and the Pittsburg and Steubenville Railroad Company cannot affect the Pennsylvania Railroad Company. .

" 2. That it is not shown that Bradshaw purchased his bonds from the Western Transportation Company, and therefore he cannot be affected by equities existing between the transportation company and the Pittsburg and Steubenville Railroad Company.

" 3. That the other holders are purchasers for a full and valuable consideration, and most of them at par, without notice of any equities in regard to them, and therefore cannot be affected. In fact, some $80,000 of these bonds were delivered by Mr. Thomson as late as January 1865, a considerable length of time after the alleged default of the transportation company. By thus permitting these bonds to be delivered and negotiated, it is too late for the Pittsburg and Steubenville Railroad Company to allege any such equities as between them and such holders.

" 4. That McElrath, the trustee in the mortgages, could not be affected by any of such equities.

" 5. That the mortgage provides that ' nothing herein contained shall preclude the said parties of the second part from instituting any proceedings at law or equity on the mortgage which they may deem necessary or expedient for the benefit of the holders of said loan.' The Act of April 11th 1862 gives chancery powers to the Supreme Court in cases of mortgages by railroad companies. It can be scarcely maintained that a trustee filing a bill under this act for the purpose of securing the bondholders, is adding a new remedy, and thus impairing the obligation of the contract. He is simply seeking to effect what was intended—the security of the holders of the bonds.

" 6. That the fact of an over-due coupon being on a bond does not put the party purchasing on inquiry, and therefore he does not buy with notice of equities as to the bonds. This position might perhaps be of some force as to the coupon thus dishonored, but certainly cannot apply to the bond that is not due. The master is therefore of opinion that a decree should be made for complainants.

" As to the coupons and the interest due, the master has had considerable difficulty—

" 1. Whether interest on coupons should be calculated from the time of the delivery of the bonds by Mr. Thomson to the Western Transportation Company.

" 2. Whether all the coupons should be added from the date of

the bonds, 1st August 1856, or only those after the delivery by Mr. Thomson.

" 3. Whether interest should be added to the over-due coupons from the date of their maturing to the present time.

" 4. Whether interest should be calculated from the time the demand was made for their payment.

"The contract of June 3d 1858 provides as follows:—' And it is further covenanted and agreed between the parties that the said the Pittsburg and Steubenville Railroad Company shall and will issue, transfer, assign and pay over to the president, for the time being, of the Pennsylvania Railroad Company, as trustee for said Western Transportation Company, and for the use of the said transportation company, as hereinafter mentioned, all the coupon first-mortgage bonds of the said Pittsburg and Steubenville Railroad Company, to the amount of $1,000,000, which, by their charter, they are empowered to issue, and the said mortgage given to secure the same, which bonds shall be made payable in twenty-five years from the *date thereof*, and shall *bear interest at the rate of* 7 *per cent. per annum, payable semi-annually from such date.*' Thus it seems that a part of the consideration of the contract was the coupons that were then attached to the bonds, as the transportation company would most certainly have been entitled to interest, from time to time, for money expended for work done. By the testimony it appears that 979 coupons have been cancelled, or are held by the Pittsburg and Steubenville Railroad Company. When cancelled, or when they came into such possession, does not appear.

" The master is of opinion that all the coupons, from February 1st 1857, should be included, deducting such as were cancelled, or are in the possession of the company.

" As to interest on over-due coupons. As the Pittsburg and Steubenville Railroad Company has been notoriously without funds, it seems that the necessity of making demand for payment of coupons was removed; and if so, interest should be calculated from the maturity of such coupons.

" Mr. Harris, cashier of the Nassau Bank, New York, at which the coupons were payable, testifies that the Pittsburg and Steubenville Railroad Company has had no account there, and there have been, at various times, coupons of first-mortgage bonds presented at the bank for payment, but the answer was *no funds.* The want of funds of the drawee will excuse the demand. In pursuance of these views the master finds that there is due on unpaid coupons $665,735, and interest $199,449.06. Total amount due $865,184.06."

The conclusions of the master against Manfull & Nicholson were:—

" From the 1st of January 1855 to the latter part of 1856,

[McElrath v. Pittsburg and Steubenville Railroad Co.]

there was on record the mortgage for $800,000. The contractors held bonds issued under this mortgage. On the 14th of April 1855, and on May 8th 1855, the cash balances due the contractors were paid them. Thus, the contractors being paid, that mortgage became, beyond any question of doubt, a first lien upon the road, and the holders of the bonds were entitled to all the security such lien gave them. The mortgage to complainants was substituted for the mortgage for $800,000, and the contractors, by giving up their bonds, assented to such substitution. Besides, such new mortgage could not affect the contractors in any manner, ' so as to defeat, postpone, endanger or delay' them.

" King & Thompson were the successors to Manfull & Nicholson, who accepted a contract under them, and in writing agreed to receive the first-mortgage bonds in part payment, showing clearly that they did not regard the mortgage as likely to endanger or delay them.

" On the 13th and 14th of August 1856 the directors of the Pittsburg and Steubenville Railroad Company passed a resolution, which provided that before any of certain drafts in favor of the sub-contractors shall be paid by this company, said Manfull, Nicholson & Co. shall agree and give security to this company to return 19 of the first-mortgage bonds heretofore issued to them for cash, at the same rate they were received by them, *or exchange the same for new mortgage-bonds of this company*. In pursuance of this resolution, Messrs. Manfull & Nicholson signed a paper containing these words : " We hereby relinquish and abandon this contract in consideration of the resolution this day and yesterday passed by the board, the terms and conditions of which resolution we this day accept and close.' This was signed A. S. Nicholson and W. S. Manfull, and is dated August 14th 1856. Thus it appears that these contractors agreed to accept these new mortgage bonds in lieu of the old ones which they held. It is therefore clear that the first mortgage cannot 'be deemed fraudulent, null and void as against such contractors.'

" This mortgage being valid, are the contractors entitled to a priority of payment?

" The contractors did not obtain judgment against the company until February 25th 1865. There was therefore no notice of any claim on their part until that day. In the mean time, these bonds had been sold and had passed into the hands of different parties. It cannot be claimed that such purchasers had notice of this claim of the contractors. It is therefore clear that they are purchasers without notice, and are entitled to priority. The purpose of the resolution of 1843 seems to have been, to prevent railroad and other corporations from transferring or assigning their property ' with a view of defeating or defrauding their contractors, and *not* with a view of creating' lien. The contractors

having agreed to receive these bonds, it cannot be said that this mortgage was made for the purpose of defeating or defrauding them. The master is therefore of opinion that the contractors have no lien prior to that of the first mortgage. In accordance with this view, this mortgage is entitled to be first paid."

The master also reported the following form of decree:—

" 1. That the mortgage in the bill of complaint mentioned, dated the 1st day of August, A. D. 1856, executed by the Pittsburg and Steubenville Railroad Company, and of which exhibit ' A,' annexed to the said bill, is a true copy, is the first lien upon the railroad tolls, franchises, property, income, estates and premises therein mentioned, referred to or described, and is effectual, valid and binding thereon ; and that the holders of the bonds, secured by said mortgage, are entitled to the benefit of all the rights and securities thereby conferred.

" 2. That the principal of the bonds secured by the said first mortgage is $1,000,000, and that on the 10th day of January, A. D. 1867, there were coupons of the said bonds due and unpaid, amounting to . . . . . . $665,735.00
" And that there was also interest due on said unpaid coupons, amounting at said date to . . 199,499.06

" Making due in all, for unpaid coupons, secured ⎱
　　 by said first mortgage, with interest thereon ⎰ $865,234.06
　　 to said date . . . . . . .

" 3. That the said The Pittsburg and Steubenville Railroad Company do pay to Thomas McElrath, the trustee in the said mortgage mentioned, within　　　　　　days after the entry of this decree, the said sum of $865,234.06, so as aforesaid ascertained and decreed to be due on the said 10th day of January, A. D. 1867.

" 4. That, in default of such payment within the period aforesaid, the said Thomas McElrath, trustee named in said mortgage, do expose to public sale the railroad, property, estates, premises, appurtenances and franchises conveyed to him by said mortgage, under such order and reference as to the terms and conditions of sale and the distribution of the proceeds thereof, as shall at the expiration of said period be made by this court, on the application of the complainants in this cause."

All the parties filed exceptions to the report, that of the complainants being that neither the report nor the decree provided for the sale of the part of the railroad in West Virginia.

*J. E. Gowen* and *T. Cuyler,* for complainants, cited, as to their own exception, Act incorporating the Pittsburg & Steubenville Railroad Company, 24th March 1849, Pamph. L. 1850, p. 952, " with power to construct a railroad commencing on the

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

Monongahela river, near Pittsburg, and running in the direction of Steubenville, on the Ohio river, to a point on the Virginia state line ;" the 1st section of the Act of April 21st 1852, Pamph. L. 418, " to extend their railroad into the city of Pittsburg to connect with the Pennsylvania Railroad, and with any other railroad at the Virginia state line ;" Act of April 18th 1853, § 10, Pamph. L. 1854, p. 828, " to subscribe to the stock of any railroad intended to connect with the road of said company, or appropriate their moneys for the construction of any connecting road, in the adjacent county or counties of the state of Virginia, and to connect with and run their cars over any connecting road ; joint resolution of the legislature of this Commonwealth of February 19th 1862, requesting the legislature of Virginia to grant the Pittsburg & Steubenville Railroad Company permission to construct a portion of their road through the territory of that Commonwealth," Pamph. L. 1862, p. 548 ; Phila. & Erie Railroad Co. *v.* The Atlantic & Great Western Railway Co., 3 P. F. Smith 30 ; Ludlow *v.* Hurd, 6 Am. Law Reg. 493 ; Shamokin Valley Railroad *v.* Livermore, 11 Wright 465 ; White Water Valley Canal Co. *v.* Vallette, 21 How. 422 ; Duncan *v.* The Proprietors, 8 Price 697 ; Fector *v.* Philpot, 12 Price 197 ; Seymour *v.* The Canandaigua & M. F. Railroad Co., 25 Barb. 284 ; Willink *v.* The Morris Canal & Banking Co., 3 Green Ch. R. 377 ; Pierce *v.* Emory, 32 N. H. 484 ; Dunham *v.* Earl, C. C. Mass., 16 Leg. Int. 45 ; Pennock *v.* Coe, 23 How. 117 ; Story's Eq. Jur., ch. 18, § 743, 744 ; Massie *v.* Watts, 6 Cranch 148 ; Beekford *v.* Kemble, 1 Sim. & Stuart 7 ; Munson *v.* Tryon, Leg. Int. vol. 24, p. 76.    As to the other exceptions, County of Beaver *v.* Armstrong, 8 Wright 63 ; Morris Canal Co. *v.* Fisher, 1 Stockton 700 ; Byles on Bills 99.

*J. Veech,* for Manfull & Nicholson, cited Acts of January 21st 1843, Purd. 60, pl. 1, Pamph. L. 367, April 4th 1862, § 1, Purd. 1266, Pamph. L. 235 ; Taylor *v.* Carryl, 12 Harris 266 ; Schaffer *v.* Cadwallader, 12 Casey 128 ; Price on Liens and Limitations 350 ; Easton Bank *v.* Commonwealth, 10 Barr 448 ; 2 Dwarris on Stat. 638, 673 ; Williams *v.* Pritchard, 4 T. R. 2, 4 ; Rix *v.* Borton, 12 A. & E. 470 ; 1 Bl. Com. 89 ; Dr. Foster's Case, 11 Rep. 57 ; Hamilton *v.* Pittsburg, 10 Casey 496.

*G. Shiras, Jr.,* for Pittsburg and Steubenville Railroad Co.

The opinion of the court was delivered, May 13th 1867, by

AGNEW, J.—This is a bill for a decree of foreclosure of a corporation mortgage, brought in this court under the Act of 11th April 1862, § 1, declaring that the Supreme Court shall have and exercise all the powers and jurisdictions of a Court of Chancery in

all cases of mortgages given by corporations. The mortgage in this case being dated on the 1st of August 1856, it is supposed this law violates the provision in the Constitution of the United States forbidding the obligation to be impaired. We perceive no such collision. The remedy provided in the mortgage for non-payment of interest is permissive, not exclusive. It is made lawful for the trustee, at the request of the holders of one-fourth in amount of the bonds secured by the mortgage, to enter and use the road, and receive the tolls and income as the means of paying the interest; but there is nothing taking away remedies for default at law or equity. On the contrary, it is expressly provided that nothing contained in the mortgage shall prevent or preclude proceedings at law or equity for the benefit of the holders of the loan. Independently of this, the Act of 1862 is merely remedial for a breach of covenant. A party in default has no ground of complaint that the legislature has given an additional remedy for his own violation of the contract. The chief objection to the proceeding made by the defendants is, that the bonds delivered by them under their construction contract to the Western Transportation Company do not justly bear interest from the date of the mortgage, and that the over-due coupons either were or ought to have been cut off before they were handed over by Mr. Thomson, the trustee appointed to receive and pay them over. Perhaps the most simple and natural answer to the objection is, that as to those cut off it is in the power of the defendants to produce and have them credited; and as to those not detached, the delivery to the trustee under the terms of the contract is primâ facie evidence of its rightfulness. But it is a more satisfactory reply that the delivery in that condition was according to the terms of the contract and the intention of the parties, and carried with it the right to negotiate them as thus delivered with the coupons on.

In the agreement of June 3d 1856, between the Steubenville Railroad Company and the Western Transportation Company, it is expressly provided that the former shall issue, transfer, assign and pay over to the president of the Pennsylvania Railroad Company, as trustee for the latter, all the coupon first-mortgage bonds of the former to the amount of $1,000,000, which shall be made payable in twenty-five years from the date, and shall bear interest from the *date*. It is provided also that the transportation company shall place in the hands of the same trustee an amount of their stock equal to $500,000, and the trustee shall in lieu thereof transfer, assign and set over to them $300,000 of the first-mortgage bonds of the Steubenville Railroad Company. It is further provided that on the examination of the chief engineer of the Pennsylvania Railroad Company, and his report that twenty or more continuous miles of the railroad are graded and ready for the track, the trustee shall have power to surrender the stock so

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

deposited, and to deliver to the transportation company a further amount of the bonds sufficient fully to iron the road, retaining, however, until the track is completed, full control and ownership over the iron for and on behalf of the railroad company. The trustee finally is authorized to deliver over all the remaining first-mortgage bonds, and the income, bonds and stock additionally provided for the fulfilment of the contract, on the report of the same chief engineer that a locomotive has been run over the road from the Monongahela river at Pittsburg to the Ohio at Steubenville. It is not alleged in the answer of the Steubenville Railroad Company that Mr. Thomson, the trustee, transferred and paid over the bonds placed in his hands contrary to the terms of the contract, or to any notice from the railroad company not to deliver them; nor is it alleged that he was required to cut off the overdue coupons and withhold them. It is not averred that any notice was given by the railroad company to him or to the transportation company of any claim or right of the railroad company to retain the coupons for a failure to build the road in time. On the contrary, it is admitted in the answer that the transportation company has, in pursuance of said contract and lease, gone on and finished said road, and is now actually operating said road as a thoroughfare; that under and by virtue of said Acts of Assembly, and agreements in pursuance thereof, the said road and appertenances, and the franchises pertaining thereto, and the possession thereof, are vested in the Western Transportation Company.

The answer also admits that the Steubenville Railroad Company not only were to execute and deliver, but did execute and deliver unto and for the use of the Western Transportation Company the mortgages and bonds set forth in the bill. The proof shows that a large part of the work had been done by the former contractors, and that the delivery of the bonds by the trustee to the transportation company did not begin until they had been at work about a year under their contract. The facts of the case then are these: The transportation company was entitled by the contract to the interest on the bonds from their date. The railroad company accordingly delivered the bonds to the trustee without detaching the over-due coupons. The transportation company has built and finished the road, and is in possession operating it under the lease. The trustee, from time to time, delivered to them the bonds and coupons placed in his hands for the payment of the work done by them without any notice or objection by the railroad company to the contrary. The transportation company have negotiated the bonds to third parties, as they had a right to do, in the absence of notice or complaint. The railroad company had provided for its own security by a deposit of stock in the hands of the trustee to the extent of $300,000 of bonds, and by providing for a report of a disinterested person as to the progress of the

work before the delivery of the remainder, besides having in the hands of the trustee a further deposit of income, bonds and stock to be paid over upon the finishing of the work.   In this state of facts it is clear the consideration of the first-mortgage bonds has not failed.   The railroad company have received performance of the construction contract, and have a finished road in the hands of their lessees.   The present claim is therefore simply for damages for the delay, and rests upon a distinct covenant to perform without unnecessary delay, modified and extended by subsequent agreement.

The bonds having been legitimately handed over as a payment under the contract, carried with them their contract incident, to wit, the interest from date.   This being done by the act and agreement of the parties through their trustee, this title passed to the holder of the bonds when negotiated, and it cannot be said that the holder of the bond, with its undetached coupons, is put upon notice of a defence as to the delay, because some of the coupons happened to be over-due.   The very purpose and intent of such bonds is to set them afloat in the market as the means of raising money to build the road.   The railroad company having by their own agreement and act sent them into the current, and received a substantial consideration ‘in the construction of their road, are estopped from setting up a claim for damages against the holders because of the delay in the work.

It is unnecessary to invoke in this case the principles of the commercial law as to negotiable paper in protection of the holder, or to destroy that protection on the ground of an implied notice growing out of some of the coupons being over-due.   The case rests on its own facts, and the trustee in the mortgage is therefore entitled to a decree for the payment of the over-due interest for the benefit of the bondholders.

The next matter for consideration is the claim of Manfull & Nicholson, the first contractors, for the balance unpaid to them. The view we take of the evidence renders it unnecessary to decide whether, under the resolution of January 21st 1843 (Purd. 1861, p. 60), it is to be treated as a lien, or a debt protected from the operation of an invalid mortgage.   It seems to us upon the evidence to have no valid right to postpone the mortgage, whatever may be its title to payment as between the claimants and the Pittsburg and Steubenville Railroad Company.   The contract of 1852, between Manfull, Nicholson & Co. and the railroad company, had come to a stand in its execution.   The company began to fail in the sources of its supply of money to build the road. On the 14th of December 1855 a settlement took place between Manfull & Nicholson and a committee of the railroad company. The total amount of work done was then $647,748.99, upon which there was unpaid a cash balance of $34,792.55, and the sum of

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

$18,910.31, for retained percentage, payable in first-mortgage bonds which the committee recommended to be paid. At that time, the $800,000 mortgage of January 1st 1855 was the only first mortgage. Manfull & Nicholson received nineteen $1000 bonds issued under this mortgage. In order to obtain the means of finishing the road the railroad company entered into a contract with King & Thompson for its construction. This arrangement consisted of a series of agreements, beginning on the 10th of May 1856 and concluded the 30th of July 1856, followed by sundry modifications by resolutions of the railroad company under a power reserved in the contract. These resolutions were dated September 1st, September 27th, September 29th and October 9th 1856. It was not until the meeting of October 9th 1856 the final order was made for the issuing of the two mortgages of August 1st 1856. They were accordingly acknowledged the next day, October 10th. In the first one of the series of agreements between the railroad company and King & Thompson, dated May 10th 1856, it was covenanted by the company that their railroad and property were free and clear of all encumbrances, and that the company should issue mortgage-bonds to the amount of $1,500,000 to build the road. In the second agreement, dated June 18th 1856, it was agreed that the $800,000 mortgage should be removed, and the bonds issued under it taken up and cancelled. In the third of the series of July 29th 1856 it was provided that the mortgage-bonds contracted for should be divided into one mortgage for $1,000,000 and another for $500,000. It thus appears that the negotiations between the railroad company and King & Thompson were not finished to enable them to usher in their two mortgages until the 10th of October 1856. In the mean time a settlement between the railroad company and Manfull & Nicholson was necessary to enable the company to complete its arrangements with King & Thompson. On the 13th of August 1856 Manfull & Nicholson, having a stock *debt* against the company of $83,818.24, which they were unable to carry, proposed an exchange of $12,500 of stock for cash, which, with a bill for extra work submitted by Mitchell, they declared, if accepted, should be considered as a final settlement. The proposition was not accepted, but after sundry modifications on the next day, August 14th, they closed with the railroad company, and signed a paper attached to their contract, in which they " relinquished and abandoned their contract in consideration of the resolutions passed by the board on the 13th and 14th of August, the terms of which they accepted and closed." One of these resolutions required that the sum it ordered to be paid to them should be in full of all claims under their contract, and that they abandon and relinquish the same ; another provided that they should return the nineteen bonds they

held under the $800,000 mortgage, and use their efforts to procure the balance.

On the 29th of August 1856, but fifteen days after the settlement, Manfull & Nicholson contracted with King & Thompson for the construction and finishing of the twenty-nine sections of the railroad, excepting No. 2 and parts of 3 and 24. This construction contract, it will be observed, was entered into by King & Thompson with Manfull & Nicholson before the railroad company had yet cleared the way for the issue of the mortgages dated August 1st, but not acknowledged until October 10th.

Now in this connection we are to take the testimony of Mr. Von Bonnhorst, the secretary of the railroad company, that the making of the contract between the company and King & Thompson was known to Manfull & Nicholson, and that they made no objection, and that they knew the appropriation of the bonds to be issued under the mortgage made by the contract between the company and King & Thompson, and that the nineteen bonds held by Manfull & Nicholson were afterwards returned by them to King & Thompson, who exchanged them for the new mortgage-bonds. In the settlement of August 14th it also appeared that all the work done by Manfull & Nicholson, after the settlement of 14th December 1855, a period of eight months, amounted only to the sum of $30,377.77. From these facts it very clearly appears that Manfull & Nicholson had ceased to work upon the road, and that the negotiations between the railroad company and King & Thompson were going on not only with the knowledge of Manfull & Nicholson, but with their assent, as the only apparent means of prosecuting the work which they were to complete under their contract with King & Thompson, and that without their co-operation the contract between the company and King & Thompson could not be consummated. That contract required the road and property of the company to be cleared of all encumbrances. Their contract for construction and the $800,000 mortgage were encumbrances to be put out of the way. Hence the terms of their settlement of 14th August 1856 required them to relinquish and abandon the contract, and to return the nineteen bonds in their hands·; and to assist getting up the others. In the light of these facts the writing signed by Manfull & Nicholson of the 14th of August, appears clearly to be an abandonment of all claims under their contract, and with it a relinquishment of any lien they had upon the road as contractors under the resolution of 1843. Their encumbrance upon the road was removed by their own act and assent in order to let in the mortgages of August 1st 1856, and as the means of carrying out the contract of the company with King & Thompson, and of King & Thompson with themselves. The plaintiff excepts to the report of the master, on the ground that he omitted to incorporate into the form of a decree submitted

[McElrath *v.* Pittsburg and Steubenville Railroad Co.]

by him a provision ordering the trustee in the mortgage to sell the estate and title of the Steubenville Railroad Company in that portion of the railroad situate in the state of West Virginia. Without deciding what estate would pass by the trustee's sale under the mortgage, we are of opinion that we can, by our decree operating upon the trustee himself, authorize and compel him to sell and convey whatever interest of the railroad company will pass under the terms of the mortgage.

As it is the desire of all the parties expressed in the argument that in the event of a decree of sale being made, the sale should pass all possible titles and interest of the railroad company in the whole extent of the road, we will direct that the master's report shall be so amended.

Let a decree be drawn and entered in this case in the form reported by the master, inserting ninety in the blank left for the number of the days in the 3d section, and adding to the 4th section the following words: " And that such order shall contain an authority and direction to the said Thomas McElrath, the trustee, to sell and convey all the estate, right, title, interest, claim and demand of the said the Pittsburg and Steubenville Railroad Company, of and in that portion of the railroad operated and run by the said company, through their lessees, in the state of West Virginia, between the boundary line of the state of Pennsylvania, at the easterly end, and the river Ohio at the westerly end, which passed to him under and by force of the terms and intent of the said mortgage mentioned in the first section of this decree."

And it is further ordered that the costs in this case be paid by the Pittsburg and Steubenville Railroad Company.